UNITED STATED DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
SHERWYN TOPPIN MARKETING CONSULTANTS, INC. d/b/a TEMPTATIONS TAVERN, and EWART BURTON, individually,

                                    Plaintiffs

    --Against --

EVAN GLUCK, *individually*,
GABRIEL TAUSSIG, individually,
MOHAMMED QURESHI, individually,
MIKE JONES, individually, and
THE NEW YORK STATE LIQUOR AUTHORITY,
                                   Defendants
-----------------------------------------------------------X

**COMPLAINT**
<u>JURY TRIAL DEMANDED</u>

CV 11 - 3951
MATSUMOTO, J.
GOLD, M.J.

      Plaintiffs, SHERWYN TOPPIN MARKETING CONSULTANTS, INC. d/b/a TEMPTATIONS TAVERN, and EWART BURTON, individually, by their attorneys, LAW OFFICES OF AMBROSE WOTORSON, allege as follows:

    I.    <u>INTRODUCTION</u>

    1.    This is an action to vindicate the civil rights of plaintiffs. Plaintiffs contend that defendants conspired to deprive plaintiffs' of their liberty by means of malicious prosecutions and malicious abuses of process, without excuse or legitimate justification. Moreover, all of the defendants aided and abetted a systematic falsification of affidavits purporting to be those of arresting police officers, undercover police officers and other police officers in pursuit of spurious nuisance abatement claims and equally false Alcohol Beverage Control Law violations. Plaintiffs also contend that defendants sought to punish plaintiffs because plaintiffs petitioned government for redress of their grievances through a prior Section 1983 lawsuit against the agencies which employ defendants and officers who work for, or work closely with, the agencies which employ defendants. These agencies include the City of New

York, the New York City Police Department and the New York State Liquor Authority. These misdeeds are ongoing in nature.

## II. JURISDICTION

2. This Court has jurisdiction over this action under 42 U.S.C. Section 1983. Venue is proper, as the operative events occurred within this judicial district.

## III. PARTIES

3. SHERWYN TOPPIN MARKETING CONSULTANTS, INC. is a "person," and it is a privately-owned company that is incorporated in the State of New York. It may sue and be sued, and its principal place of business is located at 2210 Church Avenue in Brooklyn, New York, and at all relevant times, it operated TEMPTATIONS TAVERN, (hereinafter "the club") a cultural arts center located in Kings County, New York.

4. EWART BURTON, (hereinafter "plaintiff") who resides in Kings County, New York, hereby sues in on his own behalf, individually. At all relevant times, plaintiff served as the General Manager of SHERWYN TOPPIN MARKETING CONSULTANTS, INC., d/b/a TEMPTATIONS TAVERN.

5. Defendants, EVAN GLUCK, individually; GABRIEL TAUSSIG, individually; MOHAMMED QURESHI, individually; and MIKE JONES, individually, at all relevant times, were employed by the City of New York and the New York State Liquor Authority as attorneys supervisors, and as an executive officer. They are herein sued in their individual capacities for violating plaintiffs' protected civil rights while acting under color of state law.

6. EVAN GLUCK, is an attorney employed by the New York City Police Department, whom upon information, belief and his own admissions, falsely asserted that that some nineteen (19) police affidavits were reviewed, verified and signed in his presence. MOHAMMED QURESHI, a supervising attorney in the New York City Police Department's

Legal Bureau and GABRIEL TAUSSIG, the Chief of the Administrative Law Division of the New York City Law Department, in the course of giving direction to Evan Gluck, knew or had reason to know, that the Nuisance Abatement complaint and affidavits used to obtain a Temporary Restraining Order closing plaintiffs' night club were not properly notarized, were largely un-reviewed and were largely false, as they reviewed, approved and verified the Complaint and the Order to Show Cause papers against plaintiffs. These were acts to specifically aid and to abet fraud, retaliation, malicious prosecution and malicious abuse of process against plaintiffs.

7. Further, MIKE JONES, whom upon information and belief is an Assistant Chief Executive Officer at the New York State Liquor Authority, attended one or more sessions of the Nuisance Abatement case, was kept abreast about the progress of the case and knew or had good reason to know that the Nuisance Abatement case against plaintiffs was extraordinarily weak, and that no set of facts could legally and adequately support a subsequent State Liquor Authority prosecution of alleged Alcohol Beverage Control Law violations.

8. Still, MIKE JONES, directly coordinated, approved and ensured the continuation of the failed Nuisance Abatement case, in an albeit in administrative format, against plaintiffs, in part, as an accommodation to the New York City Police Department and officials so employed by that Department who wished muzzle plaintiffs because of their prior Section 1983 lawsuit and/or who wished to see plaintiffs' night club driven out of business. These were acts to specifically aid and to abet fraud, retaliation, malicious prosecution and malicious abuse of process against plaintiffs.

9. Defendants, THE NEW YORK STATE LIQUOR AUTHORITY is a state actor for 42 U.S.C. Section 1983 purposes. Defendants may sue and be sued, and its principle place of business is in Albany, New York at 80 S. Swan Street, Suite 900, Albany, New York 12210. At

all relevant times, the NEW YORK STATE LIQUOR AUTHORITY employed MIKE JONES, ESQ., defendants listed herein. It is being sued for instituting and maintaining a bad faith prosecution of plaintiffs for largely non-existent Alcohol and Beverage Law violations, and for flouting the authority of a sitting New York State Supreme Court Judge and failing to give full faith and credit to a decision by the self same judge. The prosecution was maintain and instituted to obtain illegitimate collateral objectives.

IV. FACTUAL AVERMENTS

10. Defendants violated plaintiffs' civil and commercial rights in the following ways:

a. On or about April 3, 2008, plaintiffs filed a Section 1983 lawsuit against the City of New York and several law enforcement individuals for a series of false arrests, malicious prosecutions and a pattern of harassment which plaintiffs contended were designed to drive them out of business because they are Caribbean, black and black-owned. Further, the Complaint notes that there is a widespread policy of police misconduct and separately, racially lopsided prosecutions of Black/Caribbean owned nightclubs. This is a matter of public concern.

b. On or about September 9, 2008, defendants interposed an Answer denying the allegations contained in the Complaint.

c. On March 17, 2011, defendant, Evan Gluck, with the imprimatur of his supervisors, Mohammed Qureshi and Gabriel Taussig, filed a quasi-criminal Nuisance Abatement action against plaintiffs *and the New York State Liquor Authority in Kings County State Supreme Court*, and obtained, *ex-parte*, a Temporary Restraining Order forcing plaintiffs to cease their Night club operations on March 21, 2011.

4

d. Based upon the number of affidavits all sworn to for the truth of the facts asserted, the Court determined that it had no choice but to Order a Temporary Restraining Order closing "Temptations Tavern" until a full hearing on the merits of the matter could be heard. However, those affidavits were not properly sworn to. Thus, Defendants, Gluck, Qureshi and Taussig obtained a Temporary Restraining Order against plaintiffs by artifice and by fraud. This was done to obtain illegitimate collateral objectives.

e. Gluck, Qureshi and Taussig knew, or had reason to know that the allegations contained in the Complaint were largely false and that the supporting affidavits were not only false, but were not properly reviewed by, or sworn to, by the police witnesses. In particular, Qureshi and Taussig were well aware of plaintiffs' pending Section 1983 lawsuit, and upon information and belief, oversaw, approved and verified the Nuisance Abatement claim, which lacked basis and was purely retaliatory. This too, was done to obtain illegitimate collateral objectives.

f. The lawsuit falsely claimed that Temptations Tavern, "permitted" drug activity, gun play, illegal drinking and general violence with specific examples cited for December 25, 2009, January 9, 2010, April 10, 2010, April 11, 2010, April 17, 2010, May 13, 2010, July 8, 2010, July 24, 2010, August 14 2010, October 10, 2010, January 22, 2011, January 23, 2011, February 25, 2011 and March 5, 2011. The Complaint also claimed that plaintiffs' activities had an adverse impact upon the local community where their nightclub is situated. Defendants Gluck and Qureshi, whom upon and information and belief, inserted narratives into the Complaints and affidavits without ascertaining their veracity, knew or had reason to know that the true facts behind the narratives were legally insufficient to

5

sustain any Alcohol Beverage Law violations. Moreover, Taussig – who oversaw, investigated and otherwise verified the Nuisance Abatement Complaint, knew or had reason to know that the true facts behind the narratives were legally insufficient to sustain any Alcohol Beverage Law violations.

g. The Complaint and Order to Show Cause papers, which attached some nineteen (19) police affidavits, was signed by Evan Gluck whom upon information and belief, was at the time employed with the New York City Police Department's Legal Bureau. The Complaint was "verified" by Gabriel Taussig whom upon information and belief is the Chief of the Administrative Law Division of the New York City Law Department. Notably, many of the affidavits attached to the complaint and Order to Show Cause papers concerned events that transpired as far back as six months prior to the affidavits being signed and notarized. Further, at all relevant times, Gluck and his supervisors, Taussig and Qureshi knew or had reason to know that these affidavits were false and were not properly sworn to when they were filed in Kings County State Supreme Court. Indeed, Quershi was observed reviewing police affidavits which had been signed by the police officers, but not notarized. Similarly, Taussig, by investing the Complaint and verifying it, knew or had reason to know that the true facts behind the narratives were legally insufficient to sustain any Alcohol Beverage Law violation charges. Still Taussig approved and verified the Nuisance Abatement Complaint against plaintiffs to obtain illegitimate collateral objectives.

h. Plaintiffs denied the allegations in the Nuisance Abatement Complaint, and from March 24, 2011 through to March 31, 2011, a hearing was held before a Kings County State Supreme Court Judge, and all of the allegations contained in the

    Nuisance Abatement Complaint and the attached affidavits were fully litigated. Indeed, the City of New York and plaintiffs in the instant case, presented evidence, conducted direct examinations and conducted cross-examinations of both police and civilian witnesses. At no point did the New York State Liquor Authority move to be dismissed from the case, and it had attorneys present for some of the Nuisance Abatement proceedings.[1]

i. After five (5) days of testimony, Honorable Richard Velasquez, S.C.J., issued a seven paged, "interim" Decision and Order dismissing the Nuisance Abatement case against plaintiffs, but fining them $2000 for a single incident captured on video of a patron nursing a beer after permitted hours. The Court noted that the video also captured a Temptations employee eventually tapping the patron on the shoulder and asking him to surrender his beer, which he did.

j. However, in rendering this interim decision, the Court spared no fury in blasting Evan Gluck, as well as, the City of New York for presenting highly questionable evidence – including nineteen (19) police affidavits and corresponding police testimony -- during the hearing. In noting the poor quality of the evidence, the Court recounted that,

> "…it was discovered that in some cases the witnesses had not reviewed their affidavits before testifying, that the affidavits in some cases were prepared and sworn to long after the incidents at issue occurred, that all of the affidavits submitted to support plaintiff's demand for a preliminary injunction for a one year closure of Temptations Tavern were notarized by the same attorney/notary over a period of approximately three weeks in October 2010. All of these

---

[1] Defendant Evan Gluck, an attorney employed with the New York City Police Department's Legal Bureau, testified in a deposition in *Sherwyn Toppin Marketing Consultants, Inc., v. City of New York, et al. 08 Civ. 1340 (ERK)(VVP)*, that he met with lawyers from the State Liquor Authority during the Nuisance Abatement hearing, and that at least one of them made an "appearance" at the Nuisance Abatement hearing.

7

facts added to the witnesses' testimony which contradicted in many cases the facts sworn to in the witnesses' affidavits and the fact that no admissible evidence was offered to support the alleged facts in either the testimony or the affidavits. Every NYPD witness failed to produce a "DD5"-- a report written by the investigating officer immediately after the incidents to which the officer was testifying, and that several allegations made by undercovers, in particular, *lacked credibility completely.*"

k.  Unbeknownst to the plaintiffs or to the Court at the time, is the fact that those police affidavits were prepared and submitted under entirely false pretenses. In his July 18, 2011 deposition testimony[2], Evan Gluck admitted that while he notarized 19 police affidavits for the purpose of securing a Temporary Restraining Order in the Nuisance Abatement matter, not one of those police affiants reviewed and signed "their" affidavits in his (Gluck's) presence:

> Q. Let me go to another area then if you still want to take a break you can. I want to ask you a couple of questions about the affidavits that seem to take up a large portion of Judge Velasquez's initial opinion? First of all, I have all affidavits here. I am hoping to avoid and not mark them all. Is it true that you notarized all 19 police affidavits?
> A. Yes.
> Q. Did *all* of these officers sign those affidavits in your presence?
> A. No.
> Q. Did *any* of the officers sign those affidavits in your presence?
> A. No.
> Q. At any time post the hearing before Judge Velasquez, was there any kind—trust me, I am using this word as lightly as possible. Was there any kind of investigation or any kind of backtracking, or any attempt to find out why there are all those affidavits that were signed and have you as Notary Public, but they were not signed in your presence, was there any attempt to sign?
> MR. CIAPPETTA: Objection. Answer the question if you understand what he is asking.

---

[2] Gluck was deposed in the matter of <u>Sherwyn Toppin MKTG, et. al. v. City of New York, et. al.</u> 08-1340 (ERK)(VVP)

> MR. WOTORSON: I will rephrase.
> Q. Did you understand me, would you like me to rephrase.
> A. Sure.
> Q. Was there any investigation as to why there were 19 affidavits that you notarized, but in fact these affidavits were not signed in your presence?
> MS. HOGGAN: Objection.
> A. Yes
> Q. Who headed that investigation?
>   MR. CIAPPETTA: Objection.
>   MS. HOGGAN: Objection.
> A. I don't have his name at the moment, but it's a lieutenant.
> Q. A police lieutenant?
> A. Yes
> Q. Is that investigation complete?
> A. No

l.  Attorney Gluck even admitted that he had falsely notarized affidavits in this regard on between ten (10) to twenty (20) other cases:

> Q. Is this instance of the 19 police officers signing affidavits but not in your presence, is this the first time that you had notarized several affidavits without the officers signing in your presence, or is this something that you had done before.
> A. Well, maybe just ask is that the first time?
> Q. What is easier?
> A. No.
> Q. Sorry?
> A. No.
> Q. Tell me about other times that you recollect were you done in this way, and who was aware of it.
>   MR. CIAPPETTA: Objection.
> A. I can't recall every specific affidavit, but I do recall doing it for prior affidavits. I can't recall specifically which ones, but its possible that Mohammed Quhshi might have see some of those, but I can't recall specifically, so it's possible he didn't.
> Q. I understand this is very difficult for you to do. I am unaware. I press, with me you should relax. I apologize for asking this question again, because I'm obviously trying to get at something. Are you able to tell me roughly on how many different cases there were where you had notarized affidavits but with the officers actually signing in your presence?
> A. Do you want a specific number?
> Q. As best you can estimate. When I say cases, not each and every affidavit, separate nu[is]ance abatement case. For

9

example, Temptations prosecution would be one case you did that, so we know of one. How many other cases roughly do you recollect that you did that, you believe you done that on?

A. Maybe anywhere between could be like maybe *between 10 to 15, 20 possibly.*

m.  Upon information and belief, Mohammed Qureshi and Gabriel Taussig who assisted Gluck in the preparation of the affidavits and the Nuisance Abatement Complaint, were well aware that the affidavits were not properly sworn to and that the allegations contained in the Complaint and the affidavits were largely false. Indeed, both Quershi and Taussig were charged with investigating and verifying the truthfulness of the Complaint. In particular, Taussig, the Chief of the Administrative Law Division of the New York City vouched for the Complaint's truthfulness in writing in order to obtain illegitimate collateral objectives.

n.  In any event, the Nuisance Abatement Court also made a specific finding that there was no evidence that noise, disturbance, misconduct or disorder in the operation of plaintiffs' nightclub or the conduct of their patrons adversely affected the health, welfare and safety of the community where the club is situated, or affected public decency. Indeed, the Court noted that,

> "…equally as troubling was the fact that although plaintiff [City of New York] and plaintiff's witnesses made much of the fact that the "community" was very disturbed and at risk of violence/harm by the operation of Temptations Tavern in the neighborhood, not one single letter complaint, record of telephone complaints, not a single member of the community testified against defendant, no church members or even a community board member testified against defendant."

o.  Also unbeknownst to plaintiffs and to the Court, is that while the New York State Liquor Authority was a named defendant in the Nuisance Abatement action, defendant Evan Gluck, the lawyer assigned to prosecute the City of New York's

Nuisance Abatement claim against plaintiffs, had "communications" with Mike Jones and Robert Buckley, lawyers at the New York State Liquor Authority, with Nicholas Ciappetta, a lawyer assigned to defend the City of New York against plaintiffs' Section 1983 action, and with defendant Gabriel Taussig, Ciappetta's boss in the Administrative Law Division of the New York City Law Department. These communications occurred *before* and during the Nuisance Abatement action against plaintiffs, and the communications were specifically about plaintiffs[3].

p. After plaintiffs successfully repelled the City of New York's suspiciously-timed Nuisance Abatement action, Robert F. Buckley, Esq., a New York State Liquor Authority lawyer with whom Gluck had communicated with regarding Temptations Tavern before and after the Nuisance Abatement action was filed, simply re-filed the failed Nuisance Abatement case with the New York State Liquor Authority on May 13, 2011. Upon information and belief, Buckley knew or should have know that his actions were barred by the doctrines of *res judicata* and collateral estoppel, but he filed this new Complaint in bad faith and as part of a conspiracy to violate plaintiffs' civil rights. Upon information and belief, Mike Jones, an executive with the New York State Liquor Authority, approved the filing and maintenance of this administrative case against plaintiffs even though he too was well aware that the Complaint was barred because of *res judicata* and collateral estoppel principles. Jones did this to obtain illegitimate collateral objectives.

q. That administrative pleading covered claims raised in the failed Nuisance Abatement case, and it alleged that plaintiffs had somehow suffered and/or

---

[3] According to Evan Gluck, Gabriel Taussig reviewed and verified the Nuisance Abatement case

11

        permitted violations of the Alcohol and Beverage Control Laws on December 25, 2009, January 9, 2010, April 10, 2010, April 11, 2010, April 17, 2010, May 13, 2010, July 8, 2010, July 24, 2010, October 10, 2010, January 22, 2011 and January 23, 2011. The State Liquor Authority pleading also alleged that the cumulative impact of these alleged violations adversely affected the health, welfare and safety of the community, causing it to become a "focal point" of police attention.

r.    At the beginning of the administrative proceeding against plaintiffs, Martin Mehler, Esq., the attorney for plaintiffs, made a motion to dismiss the Complaint on *res judicata* grounds in light of the April 4, 2011 Nuisance Abatement decision in Kings County State Supreme Court. That motion was denied. The administrative hearing was held over a period of several days: April 15, April 18, April 21, April 29, May 2, May 9, May 13, May 16 and May 20, 2011.

s.    On June 13, 2011, the ALJ rendered an opinion finding, contrary to the Kings County State Supreme Court's interim written decision, that plaintiffs on April 17, 2010, permitted the sale of alcoholic beverages during prohibited hours; that on January 23, 2010, plaintiffs permitted the consumption of alcoholic beverages after prohibited hours; and that cumulative impact of these alleged violations adversely affected the health, welfare and safety of the community, causing it to become a "focal point" of police attention.

t.    As a result of the "focal point" conclusion, the New York State Liquor Authority is now poised to revoke plaintiffs' license to operate a nightclub. The ALJ had no authority to issue any opinion against plaintiffs based upon facts which had already been decided. But for the Robert Buckley's filing of a new case against plaintiffs against the plaintiffs.

in bad faith, the New York State Liquor Authority would not be in a position to revoke plaintiffs' license to operate a nightclub.

u. Two days later, on June 15, 2011, the Court in the Nuisance Abatement proceeding, issued a thoughtful forty (40) paged final decision dismissing the Nuisance Abatement action against plaintiffs and raising serious questions about how the City of New York prosecutes Nuisance Abatement claims. The Court offered that:

> "It is of concern to this Court that when a decision is made by the NYPD legal department, or other authority, to prosecute any entity, including Temptations Tavern, for violations as alleged herein, more time was not spent investigating whether such violations actually existed, and if they did exist, how to demonstrate proof of their existence in the manner required by law."

v. In any event, the Court found with respect to the April 17, 2010 after-hours sales charge that,

> "Undercover Detective #CO143 provided an affidavit in which he contended that he was a member of a field team assigned to investigate possible violations of the Alcoholic Beverage Control law occurring at Temptations Tavern. He affirmed that while he was in the Club from 4:15 a.m. until 5:00 a.m. on April 17, 2010, he purchased various alcoholic beverages from six (6) bartenders selling alcoholic beverages to other patrons as well. He determined that all of these beverages were alcoholic based on his training and observations. No containers or liquid was gathered for testing. The field team was called in at 6:00 a.m. and six bartenders were arrested. No physical evidence of any kind was vouchered. None of the six bartenders were identified by name, location within Temptations Tavern, or description. No evidence was provided to demonstrate that the six bartenders had indeed been arrested. No testimony was provided as to the outcome of the arrests. The court also finds that undercover Detective #CO143's allegations as contained in his sworn affidavit which was seven (7) paragraphs long, were not supported by any details, documents, reports, or any evidence at all. Plaintiff's allegations of after-hours drinking on April 17, 2010 are not

sustained. A sworn affidavit for the same date was provided by Undercover Detective #CO224. This affidavit contained the identical language of Undercover Detective #CO 143's affidavit. Likewise, it provides no reports, documents or any admissible evidence to support said allegations. Plaintiff's [City of New York] allegations of after hours drinking and sale of alcoholic beverages by undercover Detectives #CO224 are likewise not sustained."

w. The Court left no room for any misinterpretation that the City' witnesses, particularly the undercover witnesses, were telling tall tales at trial. The Court singled out UC # 155's testimony with respect to the charges stemming from April 17, 2010. The Court observed that UC # 155's recall of important details of April 17, 2010, approximately a year later, simply strained credulity:

"He [UC # 155] testified that he was sent to Temptations Tavern on April 17, 2010, but did not recall the exact time, though he was certain it was after 4:00 a.m. He and other officers bought drinks from a bartender, but because April 17, 2010 was almost one year ago, he did not remember the time of his purchase or other details so well. From this point on, however, Undercover #CO155 testified in detail about the purchase of alcohol from a female bartender, how precisely the transaction was made, various areas of Temptations Tavern he visited, the brand of alcohol he purchased from one female bartender, and that he bought drinks and poured the contents out in the bathroom, He had no reports or documents with him as he testified, and almost none of the facts he provided in his twenty-two (22) pages of direct testimony were contained in the affidavit he submitted for the temporary closing order."

x. The Court further observed that UC # 155's testimony broke down upon the weight of cross-examination, and concluded that UC # 155'S testimony regarding April 17, 2010 was not credible. The Court noted that:

On cross-examination the undercover testified that had reviewed his DD-5 before coming to court, but that he did not have his DD-5 with him as he testified. When asked if any of the details he had testified to regarding April 17, 2010, were in his affidavit, he testified that they were not. His only explanation for this was that he had not prepared his

affidavit. He provided no documentation, no reports, no physical evidence whatsoever to support his testimony. While he alleged that he had reviewed his DD-5 before coming to court, he was not sure that all of the details he provided in his testimony was recorded in his DD-5. And, as already stated, he did not bring his DD-5 to Court. Further, the Undercover did not bring a copy of his expense report which would have indicated the amounts of cash he spent on his drinks and the bottle of vodka, as well as the tips he gave the "female" who sold him the Hennessy and Vodka. He could not describe the person who took the bottle of vodka from him along with other drinks and a cup. None of the prerecorded buy money used to pay for these items was recovered, and no attempt was made to recover it. On cross-examination he also testified that he did not think it was necessary to provide a description of the person who took the drinks, cup, and bottle of vodka out of his hand to the field team. He was not asked nor did he bring any supporting documents made contemporaneously about these incidents to court. He admitted that he had not participated in preparing his affidavit, and that most of the "facts" he testified to were not in his affidavit. Plaintiff's allegations were not sustained based on the witness's testimony as it was lacking in credibility.

y.  Similarly, the Court found that the charges stemming from January 23, 2010 regarding the after hours consumption of alcohol could not be sustained. The Court justified its refusal to sustain the charge by noting that:

> Sergeant Shield Number 1769 testified in Court as to several incidents, only one of which was included in his affidavit submitted for the temporary closing order. The witness began his testimony by responding to plaintiff's counsel he had had a chance to discuss the case with plaintiff's counsel the day before his Hearing appearance. The documents The Sergeant [shield Number 1769] continued his testimony by describing the after hours consumption of alcoholic beverages that he observed this same evening. His testimony on the incidents regarding after hours alcohol consumption was not included in his affidavit. The witness stated that when he entered Temptations Tavern at 4:56 a.m., he saw people drinking alcoholic beverages. when asked how he knew the beverages contained alcohol, he testified that he asked each of three individuals what they were drinking and they told the officer that the beverages they were drinking

contained alcohol. No arrests were made however, even though the individuals stated that they were drinking alcoholic beverages and it was 4:56 a.m. No contemporaneous record, report or writing of this event was made.

z. Finally, in sharp contrast to the ALJ's conclusion that Temptations Tavern had become a threat to the health and welfare of the community, the Court in the Nuisance Abatement action observed that,

> "...it is also unusual that although Temptations Tavern was described as the scene of "multiple complaints" and had a bad reputation for illegal activities, none of the community complainants were called by the plaintiff to testify at the Hearing. In fact, no one from the community surrounding Temptations Tavern testified as to its being a danger to the community and its residents, and in fact, so dangerous that immediate closure was required. There simply was no testimony at all from the "endangered" community, nor were any written complaints, documented reports, or petitions from the community provided to the Court."

aa. On June 24, 2011, Christina Hoggan, Esq., a lawyer, whom upon information and belief is assigned to the Administrative Law Division of the New York City Law Department, filed a Notice of Appearance in plaintiff's prior Section 1983 case against the City of New York.

bb. But for the wrongful filing of a frivolous Nuisance Abatement case, and a barred/bad faith filing of an administrative case based upon the same facts and transactions as the Nuisance Abatement case, plaintiffs would not have been deprived of property and liberty associated with Night club closures, and a Damoclean sword hanging ever so menacingly over their existence and livelihoods.

11. Plaintiffs' rights are clearly established and objectively established, and individual defendants could not have concluded that their acts, including, but not limited to, filing

police affidavits under false pretenses to obtain a Temporary Restraining Orders, re-prosecuting dismissed Nuisance Abatement claims in derogation of *res judicata* principles and doing so to punish plaintiffs for bringing a prior Section 1983 case against defendants, were reasonable.

12. As a further proximate result of defendants' illegal acts towards plaintiffs, plaintiffs have suffered a substantial and permanent loss of revenue.

13. As a further proximate result of defendants' illegal actions towards plaintiffs, plaintiffs have suffered substantial and permanent impairment and damage to their good names and reputations.

14. As a further proximate result of defendants' illegal actions, plaintiff, EWART BURTON has suffered mental anguish and emotional injury.

15. Defendants' illegal actions were outrageous and were malicious, and were intended to injure plaintiffs, and were done with reckless indifference to plaintiffs' protected rights, entitling plaintiffs to punitive damages as against all individual defendants herein.

V. <u>CAUSES OF ACTION</u>

<u>FIRST CAUSE OF ACTION</u>

16. Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

17. Plaintiffs' prior Section 1983 lawsuit sought to petition the government for redress of its grievances. Indeed that Complaint alleged widespread racial discrimination and police misconduct in "vice enforcement" and raised matters of public concern. However, all defendants sought to muzzle plaintiffs precisely because that lawsuit addressed matters of public concern. These rights are secured by the First Amendment of the U.S. Constitution and is made actionable under 42 U.S.C. Section 1983.

## SECOND CAUSE OF ACTION

18. Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

19. Further, by subjecting plaintiffs to an utterly unnecessary Nuisance Abatement Complaint, club closure and a trial, and an utterly unnecessary administrative trial before the New York State Liquor Authority in bad faith, all defendants committed malicious prosecution, malicious abuse of process, thereby violating the 4th, 5th and 14th Amendments of the U.S. Constitution as made actionable by 42 U.S.C. Section 1983.

## THIRD CAUSE OF ACTION

20. Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

21. By conspiring with Mike Jones to violate plaintiffs' civil rights, defendant Evan Gluck violated 42 U.S.C. Section 1985.

## FOURTH CAUSE OF ACTION

22. Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

23. By conspiring with the City of New York, Gabriel Taussig and Evan Gluck to violate plaintiffs' civil rights, defendant Mike Jones violated 42 U.S.C. Section 1985.

## FIFTH CAUSE OF ACTION

24. Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

25. By conspiring with Mike Jones to violate plaintiffs' civil rights, defendant Gabriel Taussig violated 42 U.S.C. Section 1985.

## VI. PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that this Court grant to him judgment containing the following relief:

    a. Permanent Injunctive Relief;

b.  An award of damages to be determined at the time of trial to compensate plaintiffs for mental anguish, humiliation, embarrassment, and emotional injury,

c.  Awards of punitive damages to be determined at the time of trial as against each individual defendant;

d.  Awards of reasonable attorney fees and the costs of this action and,

e.  Such other and further relief as this Court may deem just and proper.

Dated: Brooklyn, New York
       August 15, 2011

Respectfully Submitted,
Law Offices of Ambrose Wotorson

By_____/s/_____
Ambrose W. Wotorson (AWW-2412)
26 Court Street, Suite 1811
Brooklyn, New York 11242
718-797-4861